# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROXANN J. FRANKLIN-MASON,

      **Plaintiff,**

      **v.**

    Civ. Action No. 96-2505 (RWR/JMF)

JOHN H. DALTON,
Secretary of the Navy,

      **Defendant.**

## REPORT AND RECOMMENDATION

The case is before me for a Report and Recommendation on Roxann J. Franklin-Mason's

("plaintiff" or "Franklin-Mason") <u>Motion to Enforce Settlement Agreement and for Sanctions</u>

("Plains. Mot.").

## BACKGROUND

On October 31, 1996, plaintiff, an African American female, brought a Title VII action

against her former employer, the United States Navy, in the United States District Court for the

District of Columbia.  Plaintiff claimed that defendant discriminated against her on the basis of

her race and gender by not giving her a position for which she believed she was qualified and for

which she applied.

On November 4, 1997, this case was referred to me for a Report and Recommendation.

On April 9, 1998, the case was re-referred to me for settlement purposes.  After meeting with the

parties on several occasions, a settlement agreement was reached and on April 7, 1999, the

Stipulation of Settlement ("Stip.") was docketed.[1]

On December 10, 1999, following entry of the stipulation, plaintiff filed an emergency motion to enforce the terms of the settlement.  The court accepted her filing, and on May 12, 2000, Judge Sullivan denied her motion without prejudice and ordered the parties to meet in person to attempt to resolve any remaining problems regarding the implementation of the settlement agreement.  Plaintiff moved to enforce the settlement agreement twice more, and Judge Sullivan denied these motions.  On November 9, 2001, plaintiff moved, for a fourth time, to enforce the terms of the settlement agreement.  On July 8, 2002, Judge Sullivan recused himself and the case was reassigned to Judge Roberts, who subsequently referred plaintiff's fourth motion to me for a Report and Recommendation.

After initially reviewing plaintiff's motion and the terms of the settlement agreement, I concluded that there remained genuine issues of material fact.  I therefore held a hearing on the matter and was awaiting the parties' stipulations as to proposed findings of fact and conclusions of law when it occurred to me that this court may lack jurisdiction over the matter.  Further complicating the issue is the fact that plaintiff has engaged a total of four attorneys, at various points in the case, and that plaintiff has also filed a new lawsuit, in which she claims that the Navy's actions since the case was settled constitute retaliation for the filing of the original suit.  I will first address the jurisdictional issues.  I will then proceed to my findings of fact and conclusions of law as to plaintiff's two remaining claims.  By separate Report and Recommendation, I will address plaintiff's retaliation claim.

---

[1] The Stipulation of Settlement itself was dated March 26, 1999.  Judge Sullivan signed the document on April 1, 1999 and it was docketed on April 7, 1999.

**DISCUSSION**

I.    Jurisdictional Issues

A claim for breach of a Title VII settlement agreement is a contract claim within the

Tucker Act[2] and belongs in the Court of Federal Claims unless this court, pursuant to the parties'

agreement, retains jurisdiction to enforce the settlement agreement that resolved the Title VII

action. Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 381-82 (1994); Rochon v. Gonzales,

438 F.3d 1211, — (D.C. Cir.) (citing Hansson v. Norton, 411 F.3d 231, 232 (D.C. Cir. 2005) and

Brown v. United States, 389 F.3d 1296, 1297 (D.C. Cir. 2004)).

In this case, a dismissal order was entered by Judge Sullivan on February 26, 1999.  Less

than two months later, the parties filed their joint stipulation of settlement, the same stipulation

that was approved by Judge Sullivan and docketed on April 7, 1999.  According to paragraph 21

of the settlement agreement, "[e]xecution of this stipulation shall constitute a dismissal of this

action with prejudice, effective upon approval by the Court, pursuant to Federal Rules of Civil

Procedure 41(a)(i)(ii)." Stip. ¶ 21.  Thus, although an initial order of dismissal was entered by

Judge Sullivan on February 26, 1999, a second order of dismissal was entered on April 7, 1999

and it is the language contained within this second order of dismissal that is key to determining

whether or not this court may properly assert jurisdiction over the current conflict.

Paragraph 21 of the settlement agreement deems the stipulation itself an order of

dismissal.  Thus, compliance with the settlement agreement is necessarily a term of that order.

Second, the settlement agreement/dismissal order includes an express stipulation retaining this

---

[2] 28 U.S.C. § 1491(a)(1), (2).  All references to the United States Code are to the
electronic versions that appear in Westlaw and Lexis.

court's jurisdiction.  According to paragraph 22 of the parties' settlement agreement, "[s]hould

any party breach terms of this Stipulation of Settlement, the other party, shall have the right to

seek enforcement of the Stipulation with the Court including, but not limited to, monetary

damages." Stip. ¶ 22.  This is an express stipulation of retention of jurisdiction "with the Court."

Finally, and as noted above, the settlement agreement is not just embodied in the dismissal order,

it *is* the dismissal order.  The court cannot imagine what more the parties could have done to

ensure the court's retention of jurisdiction over this matter or to convey their express intent that

the court do so.

II.   <u>Plaintiff's Fourth Motion to Enforce Settlement Agreement and for Sanctions</u>

On February 2, 3, and 4, and on April 8, 2005, the court held an evidentiary hearing on

plaintiff's fourth motion to enforce the settlement agreement.  At the conclusion of the hearing,

the court directed the parties to address the propriety of the testimony given by Abbey Hairston

("Hairston") and to file proposed findings of fact and conclusions of law.

A.   <u>The Propriety of Hairston's and Smith's Testimony</u>

On the fourth day of the hearing, plaintiff called Hairston as a rebuttal witness.  Hairston,

who was plaintiff's attorney at the time of the mediation proceedings in this case, testified about

a meeting that she, along with plaintiff and plaintiff's husband, attended with Military Sealift

Command ("MSC") personnel.  In addition, Hairston testified about events that occurred both

prior to and after the settlement agreement was signed.  Gregory Smith ("Smith"), then-counsel

to MSC,[3] also provided testimony.

---

[3] At the time of his testimony, Smith was working as an attorney for the State
Department.

At the hearing, the court raised *sua sponte* the issue of whether Hairston's testimony violated the Federal Rules of Evidence. Tr. 4/8/05 at 5.  The court allowed Hairston to testify but sealed the record pending the court's resolution of whether or not the testimony would be admitted.  Although not argued at trial, the court will now consider both parties' views as to the propriety of Hairston's *and* Smith's testimony.

The confidentiality of settlement discussions that take place before a judge is governed first and foremost by the dictates of that individual judge.  Prior to the commencement of all settlement discussions that take place before me, I advise counsel and the parties that all statements made during the negotiation process are deemed confidential.  In addition, I also issue a written order to that effect.  Generally speaking, I have seldom found a reason sufficiently compelling to warrant a breach of that confidentiality,[4] although, in some rare instances, such a breach may be appropriate.  Before considering such instances, however, we must first review the parameters of Rule 408 of the Federal Rules of Evidence, which imposes its own set of restrictions on the use of evidence obtained during settlement discussions.[5]

In drafting Rule 408, the Advisory Committee "recognized that it was in the public interest, and in the interest of individual litigants, to encourage consensual resolution of disputes." Wayne D. Brazil, Protecting the Confidentiality of Settlement Negotiations, 39

---

[4] See e.g. Black v. Kendig, 227 F. Supp. 2d 153, 155 (D.D.C. 2002) (" . . . I yield to no one in my insistence that settlement discussions remain confidential."); Childers v. Slater, No. 97-CV-853, 1998 WL 429849, at *6 (D.D.C. May 15, 1998) ("Settlement discussions and settlement decisions occupy a unique and protected place in our judicial system.").

[5] Although Local Civil Rule 84.9 also addresses the confidentiality of settlement negotiations, it speaks only to those proceedings which take place under the auspices of the Court's Mediation Program and not to settlement discussions that take place before a judge.

HASTINGS L.J. 955, 958 (1988).  Thus, the rule provides that "[e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount." Fed. R. Evid. 408.

The two individuals whose testimony is at issue played a key role in the negotiation of the settlement agreement and their testimony as to what took place after the signing of the agreement clearly falls within that category of information protected under Rule 408.  Both parties, however, have agreed that this testimony should be permitted.  Generally, a party's disclosing what occurred at settlement discussions over the objection of the other would surely deter others from being frank during those discussions.  When, however, they both agree to the disclosure, there is no such inhibition; parties in future settlement discussions will know that their objection will, in itself, suffice to prevent the disclosure unless a exception based on some other principle applies.  I will therefore permit the testimony to be considered although it might fall within the prohibition of Rule 408.

B.    Detailed Findings of Fact

1.    On January 27, 1999, while negotiations between the parties were still on-going, Smith sent Assistant United States Attorney, Alex Shoaibi ("Shoaibi"), a memorandum describing the position MSC was willing to offer plaintiff as part of the settlement agreement. PEX 2 at 2-3.  On January 29, 1999, Shoaibi forwarded the memorandum to Hairston. PEX 2 at 1; DEX 3 at 1.  In his cover letter to Hairston, Shoaibi specifically noted that all of the details regarding plaintiff's position had not yet been finalized. Id.

6

2.      On February 5, 1999, Hairston replied to Shoaibi's letter. PEX 3.  Hairston

thanked him for the proposed settlement offer and outlined plaintiff's remaining concerns,

including concerns relating to the proposed chain of command. Id. at 1-2.  Hairston also

suggested that a meeting be arranged between plaintiff and the persons she would be reporting to

should she accept the settlement offer. Id.

3.      On February 23, 1999, Hairston sent Shoaibi a letter stating that she was

concerned about the delay in scheduling the meeting she had proposed in her February 5, 1999

letter. PEX 5.  Hairston stated further that plaintiff would not sign the agreement unless there was

such a meeting and the parties were able to arrive at a mutual understanding.[6] Id. at 1.

4.      Although it is unclear whether the meeting occurred before or after the signing of

the settlement agreement, what is clear is that the meeting occurred sometime before plaintiff

returned to work.  In attendance were plaintiff, plaintiff's husband, Hairston, Commodore Nelson

("Nelson"), Captain Penix ("Penix"), and Smith. Tr. 2/2/05 at 30 (testimony of Franklin-Mason);

Tr. 2/2/05 at 169-73 (testimony of Smith); Tr. 2/3/05 at 216 (testimony of Nelson); Tr. 2/4/05 at

7-8 (testimony of Penix); Tr. 4/8/05 at 11 (testimony of Hairston).  At the meeting, NFAF[7]

officials advised plaintiff that she would be responsible in part for developing her new position.

Tr. 4/8/05 at 21, 31 (testimony of Penix).  Plaintiff was also told of Nelson's plan to establish a

business office in NFAF that would include a GS-15 business manager and a GS-14 financial

---

[6] Hairston also indicated that it was her preference that the meeting be scheduled prior to
February 26, 1999, since that was the date the parties had promised Judge Sullivan that they
would let him know whether or not the case had settled. Id. at 1-2.

[7] "NFAF" stands for Naval Fleet Auxiliary Force. Tr. 2/2/05 at 33 (testimony of Franklin-
Mason).

manger to whom plaintiff would report. Tr. 2/2/05 at 32-33 (testimony of Franklin-Mason); 2/5/05 at 244-45 (testimony of Nelson).  Significantly, plaintiff was not told that the new business office in NFAF had already been authorized but rather that it was in the planning stage. Tr. 2/3/05 at 218-19 (testimony of Nelson).  Finally, plaintiff was advised that when she came to work she would be reporting to Penix. Tr. 2/2/05 at 172 (testimony of Smith); Tr. 2/3/05 at 63-64 (testimony of Smith).

5.      The parties finalized the settlement agreement on April 1, 1999 and it was approved by Judge Sullivan on April 7, 1999.

6.      On July 21, 1999, Hairston sent plaintiff an e-mail telling her that Smith had confirmed that plans for the restructuring of the NFAF financial office had not yet been approved and asking plaintiff to be patient. PEX 49.  In the same e-mail, Hairston also told plaintiff that she had received reassurances from Smith that plaintiff's job description would be clarified. Id.

7.      Just before Christmas of 1999, Nelson obtained approval to create four GS-14 positions. Tr. 2/3/05 at 51 (testimony of Smith); Tr. 2/3/05 at 220 (testimony of Nelson).  Nelson did not obtain approval for the GS-15 business manager's position. Id.

8.      On February 11, 2000, Carolyn J. Berry, Principal Classifier, COMSC, updated plaintiff's position description to add the word "Senior" before the words "Financial Analyst." PEX 15.

9.      That same day, Smith sent Hairston an e-mail explaining his understanding of the meaning of paragraph 2 of the settlement agreement. PEX 4 at 1.  Smith indicated that he did not believe that the settlement agreement's use of the word "Senior" with regard to plaintiff's title was typical under established Office of Personnel Management classification standards. Id.

Rather, Smith noted that "[i]t may, however, be used as a term of art (so to speak) internally within organizations to reflect the highest level(s) of non-supervisory or lead positions to differentiate among other positions in the same series at lower levels." Id.  Smith also noted that "an employee is considered a part of management at the GS-13 grade level if their duties require use of discretion, limited supervision, and involves [sic] issues of a complex nature as opposed to simple, recurrent, administrative duties." Id. at 2.

10.     On April 14, 2000, Smith sent Hairston an e-mail in which he indicated *inter alia* that plaintiff's position description had been changed to include the word "Senior" before the words "Financial Analyst." PEX 10 at 1.

11.     On May 11, 2000, plaintiff's official title was amended to include the word "Advisor" after the words "Senior Financial Analyst." PEX 15.

12.     On June 13, 2000, Penix signed a letter of recommendation for plaintiff. DEX 50

13.     On June 28, 2000,[8] Penix signed a performance plan and appraisal form for plaintiff. DEX 6 at 1.  The rating period was from May 1, 1999 to April 30, 2000. Id.  Plaintiff received "acceptable" ratings for four categories: 1) supervision and human resources management, 2) managerial responsibilities, 3) equal employment opportunity and 4) internal management control. Id. at 2.  In the narrative portion of the appraisal, plaintiff was described as "a valued member of the Naval Fleet Auxiliary Force (NFAF) program." Id. at 1.  In addition, Penix wrote the following: "Additionally, she has provided the Program Manger with advice, subsequent to her liaison with the Comptroller's staff, regarding several financial policy and

_____

[8] The date on this document is handwritten and appears to be June 28, 2000, but may be June 29, 2000.

9

procedure challenges.  Ms. Mason will be an integral part of the intense effort to implement the

Oracle FMS and will be relied upon to exercise her leadership and managerial expertise as a

senior level staff member." Id.

14.     On September 11, 2000, plaintiff received an e-mail from Mike Fleszar, an

accountant with the Office of the Comptroller, stating that, as per Admiral Savitsky ("Savitsky"),

nobody was to receive any financial reports prior to his monthly Admiral's brief and that if the

reports were requested prior to the brief, he would have to approve the request. Tr. 2/2/05 at 62-65

(testimony of Franklin-Mason); PEX 18 at 2.  Three days later, plaintiff sent Penix an e-mail

asking that she be designated as a PM1 staff member who was authorized to receive preliminary

financials. PEX 18 at 1.  Plaintiff believed that her ability to perform financial analysis was

purposefully being blocked by Savitsky. Tr. 2/2/05 at 68-69 (testimony of Franklin-Mason).

15.     On September 21, 2000, Nelson, on behalf of Penix, signed plaintiff's performance

plan and appraisal form. Tr. 2/3/05 at 119-23 (testimony of Franklin-Mason); Tr. 2/3/05 at 225

(testimony of Nelson); DEX 7 at 1.  The rating period was from April 1, 1999 to April 30, 2000.

As with her June 28, 2000 appraisal, plaintiff was again given an overall rating of "acceptable."

Id.

16.     On January 4, 2001, Penix sent plaintiff an e-mail indicating that, per Admiral

Holder, resumés and position descriptions for each business manager were to be submitted as part

of the development of "a strategy to provide appropriate professional growth for the Business

Mangers." PEX 17.

17.     On April 9, 2001, Penix sent plaintiff and others an e-mail indicating that all 500

series[9] positions were to now report to N8. PEX 16.  Following the issuance of the e-mail, Nelson

told plaintiff that she was exempt from the reorganization. Tr. 2/2/05 at 78-79 (testimony of

Franklin-Mason).  Plaintiff never received any formal documentation of this exemption. Tr.

2/2/05 at 80-81 (testimony of Franklin-Mason); Tr. 2/2/05 at 201 (testimony of Smith).

 18. From March through October of 2002, plaintiff was on extended leave due to two

deaths in her family and personal illness. Tr. 2/3/05 at 134-37 (testimony of Franklin-Mason);

DEX 8.  Plaintiff returned to work on November 4, 2002. DEX 9 at 4.  Following her extended

leave but prior to her actual return to work, plaintiff and her attorney met with various MSC

personnel and Captain Herb ("Herb"), who had replaced Penix as the Deputy Program Manager.

Tr. 2/4/05 at 128 (testimony of Herb).  At the meeting, plaintiff told Herb that she was not to be

given any work that required that she interact, in any fashion, with the Office of the Comptroller.

Id.  Herb, who at the time had just recently assumed his new duties, agreed that he would try to

find non-financial work for plaintiff to perform in an effort to accommodate plaintiff's request. Id.

at 133.  Later, however, as Herb became more familiar with the work of NFAF and plaintiff's

settlement agreement, he came to believe that there was nothing in the agreement that prevented

plaintiff from doing financial analysis. Tr. 2/4/05 at 144 (testimony of Herb); DEX 11 at 2.  When

he presented plaintiff with a performance plan reflecting this conclusion, plaintiff refused to sign

it. Tr. 2/4/05 at 154-57 (testimony of Herb); DEX 12-14.

 19. As of August 21, 2003, plaintiff was identified in an organizational listing as a

"Senior Financial Analyst Advisor" under NFAF Business Operations. PEX 26.  The same

---

 [9] The "500 series" is the financial series and includes plaintiff's position. Tr. 2/2/05 at 73
(testimony of Franklin-Mason).

directory listed the position of "Director, Financial Operations" as "Proposed" and the position of "Business Administration" as "Vacant." Id.

20.    On September 18, 2003, Herb asked plaintiff to prepare financial spread sheets, this time for use by Nelson. DEX 15.  According to Nelson, having these financial spreadsheets was critical to his being able to perform his job. Tr. 2/3/05 at 226-27 (testimony of Herb). Plaintiff, however, refused to do the work, saying that she was bound by the settlement agreement. DEX 15-17.  Plaintiff also indicated that she viewed this work as being demeaning to her because it was work that she would have asked her assistants to do years ago. Tr. 2/2/05 at 160-61 (testimony of Franklin-Mason).

21.    On October 15, 2003, Herb sent plaintiff an e-mail indicating that it was Command's position that the September 18, 2003 and October 5, 2003 work assignments given her did not violate the settlement agreement and that her continued refusal to do them might result in disciplinary action. PEX 25; DEX 17.  In response, plaintiff filed a preliminary injunction action in this case and Herb was advised to do nothing pending its resolution. Tr. 2/4/05 at 162 (testimony of Herb).  Thereafter, plaintiff, in essence, ceased doing any work until her early retirement in 2004. Id.

22.    As of February 27, 2004, the Naval Fleet Auxiliary Force directory still listed the position of "Director, Financial Operations" as "Proposed." DEX 5.  Plaintiff was listed as "Senior Financial Analyst Advisor." Tr. 2/3/05 at 221 (testimony of Nelson); DEX 5.

C.    Summary Findings of Fact

1.    The parties intended that plaintiff would return to work and perform the duties described in a position description that was given her and her counsel prior to the execution of the

12

settlement agreement.

2.      The parties anticipated that plaintiff would be the "Senior Financial Analyst/Advisor to the Financial Manager of the Naval Fleet Auxiliary Force (NFAF) Program (PM1) of the MSC [i.e. the Military Sealift Command]".

3.      The position described in paragraph 2 of the settlement agreement, with the duties described therein, did not come into existence in the exact manner the parties anticipated because the position of the Financial Manager of the Naval Fleet Auxiliary Force (a GS-15 position) was never created.

4.      Defendant's inability to create the promised position affected the work that plaintiff was given.  While some of it was the kind of work that she would have done had she gotten the position she was promised, some of it was not.  Additionally, this inability affected the circumstances under which plaintiff performed her duties.

5.      Initially, Herb thought that plaintiff could not do any kind of financial analysis.  Once he became more familiar with the working arrangements in his office and the settlement agreement itself, he concluded that she could do financial analysis and that her doing it, in itself, did not violate paragraph 10 of the settlement agreement.

6.      Herb was correct and assigned her work that was financial in nature, albeit not under the precise circumstances or working conditions contemplated by the parties when they entered into the settlement agreement.

7.      Plaintiff's refusal to do work given the work given her by Captain Herb was unreasonable.  Its nature did not, in itself, violate paragraph 10.  Paragraph 10 and paragraph 10 alone defines what kind of contact plaintiff may have with the Comptroller's Office and it was

impossible that an assignment in itself would violate paragraph 10.

D.    Analysis of Summary Findings of Fact

1.    The Meaning of the Term "Senior Financial Analyst/Advisor"

As explained above, Paragraph 2 of the April 7, 1999 settlement agreement states the

following:

> Defendant agrees to reinstate Plaintiff's employment with the
> Military Sealift Command (MSC).  Plaintiff's 23 years of seniority
> status is and will be recognized.  Plaintiff shall be appointed as a
> Senior Financial Analyst/Advisor to the Financial Manager of the
> Naval Fleet Auxiliary Force (NFAF) Program (PM1) of the MSC.
> The position shall be graded at a Level 13, Step 10. Plaintiff shall
> report to duty on April 12, 1999.

PEX 1 at 1.

The parties are agreed that parole evidence as to the meaning of the words "Senior

Financial Analyst/Advisor to the Financial Manager of the Naval Fleet Auxiliary Force (NFAF)

Program (PM1) of the MSC" is admissible.  In my view, the most probative evidence as to that

meaning has to come from the meeting that took place either before or after the execution of the

settlement agreement but was nevertheless contemporaneous with it.  Recollections differ as to

what occurred (as they always will) on a crucial point: in what circumstances would plaintiff

perform the duties of the senior financial analyst/advisor?  The government attendees, particularly

Smith, view the discussion at the meeting as confirming that the plaintiff would be performing her

old job with only a change in title.  Plaintiff, however, recalls a discussion of an intended

reorganization that would create a billet for a GS-15 Finance Manager to whom she would report.

This attracted her because she anticipated that working for the business manager would provide

more analytical work, would insulate her from the Comptroller's office and the people she claims

14

discriminated against her and presented a promotion opportunity to the GS-14 that was to be created upon the creation of the GS-15.

    2.    <u>Hairston's E-Mail</u>

    As often happens at trials, there is a contemporaneous document that sheds light on a crucial aspect of the case and that aids in resolving the conflict between the parties.  The document is the e-mail from Hairston to plaintiff recounting a conversation that Hairston had with Smith on July 21, 1999 (see PEX 49), after plaintiff had returned to work.  In it, Hairston refers to the meeting that had taken place and to the reorganization that Penix and Nelson had mentioned.  Hairston advised her client:

> Regarding the office situation, Greg confirmed *that the reorganization that Penix and Nelson mentioned when we met earlier this year has not yet been finalized*.  He said the Admiral has to bless it and he had not done so.  Further, Greg confirmed that the GS-14 vacancy is a reason to delay remodeling the office.  There are some politics involved in Penix getting this position and some disagreement that he should be allowed to remodel.  Thus, while he may have agreed with you to do it, some] higher authority put it on hold.  Greg suggests that you will have to be patient, he thinks it will work out after the GS-14 position is filled * the remodeling will have to be approved to accommodate the 14 and GS15 who is currently working in another area.  I agree with Greg.  If Penix has been overruled for the moment, there is nothing more to be done.  You will have to wait . . . Regarding your job description and assignments from Lucy, I provided Greg with the explanation of what is going on currently.  Greg has agreed to meet discretely with Penix and confirm whether only Lucy is to provide you with assignments.  He also is going to ask that your job description be finalized or alternatively, that Penix provide a memo to you that confirms exactly what you are to do.  He will be calling me back on this issue after he meets with Penix.

PEX 49 (italics added).

    Hairston's reference to "the reorganization that Penix and Nelson mentioned when we met

earlier this year has not yet been finalized" is the reorganization to which plaintiff referred in her testimony as to the meeting in which the GS-15 position of Finance Manager would be created and she would work under that person's supervision.  Thus, I have to say that the words "Senior Financial Analyst/Advisor to the Financial Manager of the Naval Fleet Auxiliary Force (NFAF) Program (PM1) of the MSC" were intended by the parties to describe what plaintiff would do, i.e., the duties in the position description[10] that Smith drafted to explain her job when she returned, and the circumstances under which she would do them, i.e., she would answer to the GS-15 Financial Manager in the contemplated reorganization.

>3.     The Consequences of the Reorganization Not Happening

The reorganization never occurred and the parties radically differ in their recollections of its consequences for the duties plaintiff performed.  Plaintiff's sees that period as a monumental waste of time in which she was forced to perform duties beneath her position and beneath the position she had when she first worked for MSC.  She insists that she never did the work in the position description or, at best, did it rarely.  The Navy witnesses testified that she did perform duties consistent with the position description but may have been called upon to do other things that other persons also did, irrespective of their position descriptions, because MSC had to get it done.

For my purposes, it is helpful to divide plaintiff's tenure, upon her return to work, into two periods: 1) that period of time from her arrival to the departure of Captain Penix, and 2) that

---

[10]  The position description written by Smith on January 27, 1999 and sent to Shoaibi on January 29, 1999 was intended to specify plaintiff's duties when she returned.  Hairston testified that she sought to have the description contained within Smith's memorandum incorporated into the settlement agreement but the defendant refused, explaining that it was not the government's practice to do so.  Tr. 4/8/05 at 17-18.

period of time from Penix's departure and the arrival of his successor, Captain Herb, to plaintiff's departure.

    4.    The Two Time Periods

        a.    Penix's Tenure

The conflict among the witnesses as to what plaintiff did during Penix's tenure is not easily resolved.  As to plaintiff's recollection, I believe that it is being filtered through the bitterness she feels that she was, as she put it, a victim of a "bait and switch," in which she surrendered what she considered the vast, potential value of her Title VII case in exchange for a position that the Navy knew was never going to come into existence but gulled her into thinking it would.  She also chafed at the "indignities" to which she was supposedly subject, because she had a cubicle and not an office and was asked to "buzz" people into the office because her office was closest to the door and she could see who was there.  She also was obviously upset that she was forced to either take or share assignments with Lucy Austin, whom she considered her inferior.  All of this led her to being emotionally upset to the point of seeking professional help.  While I am certainly not accusing her of prevaricating, her recollection of what occurred while she worked under Penix's supervision has been colored and affected by the defeat of her expectations as to her resuming her career.  I simply cannot credit her testimony insofar as she is attempting to convince me that no effort was made whatsoever to give her the work described in the position description.

On the other hand, Penix's testimony as to the work given plaintiff was often imprecise and he believed that plaintiff was responsible for creating the position herself.  He had to admit that he could not recall the exact work she was given but did believe that she was given work

17

consistent with the position description.

Lucy Austin brought the perspective of someone who worked with plaintiff every day and insisted that plaintiff's assignments were consistent with the position description.  While she could recall plaintiff doing "some analysis of ships' financial performance" and a monthly variance analysis to determine whether some ships were under or over a budget plan, she could not name another assignment plaintiff was given.  When she was pressed to name another assignment, she paused long enough for the court reporter to note it, and said that plaintiff would consult with program and project officers to resolve inconsistencies in financial data.  While she then described other work plaintiff was given, such as mapping the process for the use of the credit card purchases, she did say that plaintiff did not do the same level of financial analyst work that she did on a consistent and regular basis.

       b.    <u>Herb's Tenure</u>

In the second period, commencing with the arrival of Captain Herb, the situation clarified. Although he and Penix spent little time together before Herb took over, upon arrival, Herb did what he could to get a better feel for how the section worked and related to the Comptroller's Office and how plaintiff could do financial work without dealing with the Comptroller.  Initially, he decided that, until he could sort things out, he would give plaintiff non-financial work.  A person in Human Resources, named Riley, also asked him to give plaintiff non-financial work. Later, when Herb got more familiar with how the section worked and, after reviewing the entire settlement agreement, he realized that he could assign her financial work so long as it did not force her to work with the three persons named in paragraph 10 of the settlement agreement. Then, to meet plaintiff's complaint that she was not being given financial work, he drafted a

performance plan including such work as part of her duties but plaintiff refused to sign it.  Herb

then gave her assignments consistent with the plan but plaintiff refused to do them.  Plaintiff then

rejected any work that would cause any connection with the Comptroller's office to point of

refusing to use computer software, ("financial datamark") because it involved "contact" with the

Comptroller because the data or the program itself had emanated from the Comptroller's office.

Soon, lawyers and injunctions were flying, and the story ended in impasse.  Plaintiff would not do

what Herb told her, Herb threatened her with discipline, plaintiff spend her days listening to the

radio and doing the crossword until she quit.

    c.  <u>The Difference Between the Two Time Periods</u>

  In my view, the two periods are radically different.  Taking the latter first, I found Herb's

testimony to be credible and I also believe that his interpretation of Paragraph 10 of the settlement

agreement was correct.

  Paragraph 10 of the settlement agreement states the following:

> Defendant agrees that Plaintiff shall not be required to work directly
> for or be supervised by William Savitsky, Robert Hoffman, or
> Donald Petska in the normal course of her duties.  The Defendant
> further agrees that none of these individuals or any other personnel
> in the Office of the Comptroller shall be involved in any way with
> the formal evaluation of Plaintiff's work performance or in
> decisions made regarding Plaintiff's employment status.

PEX 1 at 3.

  In spite of the language of the agreement, plaintiff's attorney was concerned about the

proposed chain of command:

> It is unclear exactly who Mrs. Mason reports to on a daily basis.  It
> seems that the Commander would evaluate her.  However, the
> position appears to work daily with the NFAF Financial Manager.

We do not want to assume to know the appropriate chain of
command.  We think it would be beneficial for Mrs. Mason to meet
with the both of the person who are in these positions.  It is only fair
that all concerned will feel comfortable with the arrangements.  A
meeting would result in further clarification of the position's
functions.

Mrs. Mason is concerned about the language in the position
description that indicates that the job may require "substantial
interaction with . . . comptroller personnel".  We need to discuss
this in further detail.  Obviously, if Mrs. Mason is required to work
with Mr. Savitsky or any persons under his supervision, we have
some concerns.  We have expressed this concern previously and we
need to make certain that Mr. Savitsky, and any other responsible
management official from the past, do not have the ability to
influence Mrs. Mason's job status.

PEX 3 at 1-2.

Plaintiff was also concerned about what her exact role would be:

What was really important was that we had a meeting.  I asked for a
meeting prior to coming on board because I wanted to ensure that
certain things were in place . . . I was very confused as to how this
position would not report to the Office of the Comptroller, and
therefore, I asked for a meeting.  I wanted to meet with the people
that I was going to work with.  I had questions that needed to be
answered.  So we set up a meeting prior to me coming on board.  It
was March the 1st, I believe, 1999 . . . Because the Office of the
Comptroller controls the money and, you know, there are several
people that work under the accountants, the budget analysts, the
deputy comptroller.  They are all within that financial discipline . . .
I didn't understand how I could be separated from them."

Tr. 2/2/05 at 14, 17, 19 (testimony of Franklin Mason).  According to plaintiff, due to the fact that

an independent financial office within PM1 was never actually created, she was "doomed to have

her employment status dictated by the Comptroller." Plains. Findings at 5.

Plaintiff has consistently maintained that the terms of the settlement agreement called for a

complete separation between the staff of the independent financial office and the staff of the

20

Office of the Comptroller.  A plain reading of the language of the settlement agreement does not support this conclusion.  The agreement merely indicated that plaintiff was not to work directly for or be supervised by Savitsky, Hoffman, or Petska and that nobody within the Office of the Comptroller was to have any impact on her performance evaluations or employment status.  This is not to say, as plaintiff concluded, that she would not have any interaction whatsoever with staff of the Office of the Comptroller.

Remarkably, that both parties interpreted this provision of the agreement in this way is supported by plaintiff's former attorney.  Describing the meeting that took place between herself, plaintiff, plaintiff's husband, Nelson, Penix, and Smith, Hairston stated the following:

> And then we talked about the position itself, the job description, and I recall a lot of discussion about whether or not Mrs. Mason would have to have contact with the responsible management officials who I believe was Savitsky Hoffman and Petska (phonetic) in the Office of the Comptroller, and they assured her that those individuals would not have any ability to influence anything about her job situation, her evaluation, her pay, her leave, nothing.
>
> But what they did caution was they couldn't guarantee she would never have to be in a meeting with them, because her duties might require generating a report where she might have to give information to them, but it was more of a cautionary issue that they didn't want to make it appear to her that she would never cross their paths.
>
> But the real issue was whether or not they would have the ability to influence in any way her job security, and they assured her that that would not be the case.

Tr. 4/8/05 at 13 (testimony of Hairston).

Thus, the evidence certainly does not support plaintiff's contention that the government pulled a bait and switch, got rid of her lawsuit and then sent her back to work for the very people whom she accused of discriminating against her.  Plaintiff's position that she was to in effect

21

work in an incubator, free of all contamination by the Comptroller's Office was unreasonable. Simply put, the contacts plaintiff had and was asked to have with the Office of the Comptroller did not violate the terms of the settlement agreement and Herb was unquestionably right in so concluding.

5.    Plaintiff's TSP Account

As I explained in an earlier Memorandum Opinion, participants in the government's Thrift Savings Plan may elect among various funds in which to place their investments.  The G Fund is invested in government securities and the C Fund in the stock market. Memorandum Opinion, filed August 16, 2004 at 1.  A provision in the settlement agreement required the Navy to make a thrift savings account available to the plaintiff and $36,000 was to be deducted from the back pay award and deposited in the account.  The Navy credited to plaintiff's thrift savings account $15,395.01, representing the amount that the $36,000 would have earned had it been invested in the G fund over the relevant period of time, from January 1990 through April 11, 1999.  Dissatisfied, plaintiff claims that she is entitled to the greater amount that would have been generated had $36,000 been invested in the stock market C Fund.[11]  Thus, plaintiff seeks to achieve the dream of every day-trader, the ability to invest in the stock market retroactively.

Paragraph 6 of the settlement agreement provides:

> Defendant shall make a thrift savings account available to plaintiff. Plaintiff shall be entitled to have an annual 5% deduction calculated for the time period from January, 1990 through April 11, 1999. Based on this calculation, $36,000 shall be deducted from the back pay award of Plaintiff's settlement proceeds.

PEX 1.

---

[11] The difference is about $51,000.

On February 15, 1990, Gregory Smith transmitted to the Federal Retirement Thrift Investment Board a check for $36,000 and an election form indicating that plaintiff intended that her contributions be allocated "10% to the G Fund and 90% to the C Fund." PEX 9.  Upon her return to service, contributions from her paychecks were made as Smith indicated she had elected.

There is an OPM regulation[12] in effect that requires that in the situation presented by plaintiff's case, where the government restores funds to a thrift savings plan, upon an employee's return to duty, the money is deemed to have been invested in the G Fund and the employee's account is credited with the interest the money would have earned had it been invested in the G Fund in the period from the employee's departure from service and her return.

The settlement agreement was agreed by the parties to be an integrated agreement. PEX 1 ¶ 16.  Since paragraph 6 of the agreement does not speak to how the $36,000 will be invested, the court may not add the term based on any evidence extrinsic to the agreement. United States v. Rockwell Int'l Corp., 124 F.3d 1194, 1200 (10th Cir. 1997) (citing RESTATEMENT OF CONTRACTS (SECOND) §§ 215, 216).

Since the parties cannot be found to have any different understanding or agreement, the regulation must be obeyed and the investment of the money in the G Fund was proper.

Moreover, plaintiff's contention fails for a second reason.  Assuming Smith's letter could be (1) read to mean that the money would be invested in the C Fund and (2) reflected an earlier agreement to that effect when the settlement agreement was being negotiated, his doing so was

---

[12] 5 C.F.R. § 1605.4 (1999).  The electronic version of this section appears on Lexis in its archival database of the Code of Federal Regulations.

*ultra vires* and beyond his authority since the regulation required the investment of the funds in the G Fund.  An *ultra vires* act by the government agent does not bind the government and plaintiff is deemed to have known of the controlling regulation during the settlement negotiations whether she in fact knew of it or not. <u>Fed. Crop Ins. Corp. v. Merrill</u>, 332 U.S. 380 (1947).

      E.    <u>Conclusions</u>

     The distinction I have drawn between these two periods dictates the conclusion that I have to deal with each separately.  In the period beginning with Herb's arrival, I see no violation of the settlement agreement at least in terms of the work that plaintiff was assigned or her contact (or lack of it) with the Comptroller's Office.  As to the first period, from her return to Penix's departure, the record is less clear.  I am much less certain that she was consistently given the work described in the position description, although if she was not, I cannot conclude that it was the product of some conspiracy to pull a "bait and switch."  The real reasons were that this was a new situation for Penix and Austin who inherited a problem not of their own creation.  Thus, if not every assignment met the position description, it was not for want of trying.  Moreover, Penix and Austin, like everyone else in a working environment, know that not every task one does in a day meets some ideally perfect mesh of one's skills and the job that has to be done.  If there is any doubt about that, ask the lawyer who had stood over a xerox machine at midnight on the night before a brief is due.

     By the same token, I believe that plaintiff's inability to secure assignments that were perfectly consistent with the position description was a result of MSC's failure to create the GS-15 Financial Manager position that I have found the parties anticipated would come into creation

when plaintiff returned to work.  That failure not only affected what plaintiff was asked to do but the circumstances under which she did it, including whom she reported to, the nature of her supervision, and her relationship with Austin.  Since the parties' expectations were dashed, it is hardly surprising that, despite genuine efforts, things never worked out.

If MSC's inability to create the GS-15 Financial Manager was a substantial breach of the contract, what damages are then due plaintiff?

Plaintiff has a view of damages as grand as what she thought her Title VII case would have brought to her had she gone to trial.  According to her, not only is she entitled to keep the substantial back pay she got, the restoration of her annual and sick leave, and the contributions to the TSP account but also[13] her salary from the day of her resignation to the day she says she would have retired.  She dismisses the voluntariness of her resignation by insisting that she was constructively discharged.

Her position offends every pertinent legal principle.  If the alleged breach was substantial, she could sue in the Court of Federal Claims for the monetary damages that represent the difference between the job she was given and the job she got, assuming that this difference could be quantified. RESTATEMENT (SECOND) OF CONTRACTS [14] §§ 344(a), 347 cmt. a (1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been

---

[13] Her attorneys would keep the fees they got, too.

[14] I refer to the version of the Restatement that appears in Westlaw and is said to be current to 2005.

25

performed.").

If she could establish that this damage remedy was inadequate, she could invoke the court's equitable powers based on the jurisdiction that the court retained and demand that the Navy give her the job she bargained for.

She could not be forced to work until the order issued but, once it did, she would have to go back to work. She could rely on the implicit obligation that she had to go to work but could reasonably insist that the Navy not require her to go back to work until the Navy complied with its obligation, enforceable by the court's contempt power.

She could, in the alternative, argue that the substantial breach permitted her to continue the Title VII action she had dismissed in consideration of the agreement. Under this remedy, she would give back the money she was given and proceed upon the theory that the breach permitted recision. RESTATEMENT OF LAW OF CONTRACTS (SECOND) § 345C. Plaintiff wants no part of this; she does not want to give the money back or return to work.

Moreover, the contract did not create an employment for a term of years. Plaintiff was a federal employee and a federal employee is an at-will employee. Doe v. United States Dep't of Justice, 753 F.2d 1092, 1113 n.25 (D.C. Cir. 1985). Upon discharge, an at-will federal employee is not entitled to future pay; research fails to find a single instance where a federal court ever considered such a claim by a federal employee, let alone an instance where it was awarded. Indeed, the United States cannot be sued without its consent and any waiver of sovereign immunity must be unequivocally stated. Dorsey v. United States Dep't of Labor, 41 F.3d 1551, 1555 (D.C. Cir. 1994). While the United States has rendered itself liable for contractual damages and plaintiff and the United States had a contract, the contract did not

create an employment for any particular term.  Thus, plaintiff was employed at-will and there is simply no statute than can possibly be construed to permit a discharged at-will federal employee to be awarded future pay from the date of her discharge to the date of her intended retirement.

Indeed, in a situation involving an express waiver of sovereign immunity, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, the court of appeals for this Circuit reversed an award of front pay to a successful Title VII plaintiff from her termination to her retirement.  The court stated:

> Contrary to the district court's understanding, Barbour does not hold that a plaintiff's intention to remain at her employer until retirement, even if that intention is entirely reasonable, automatically entitles front pay for the remainder of her work life. Rather, *Barbour* includes a list of non-exhaustive factors to consider including age, See *Barbour* [v. *Merrill*, 48 F.3d 1270 (D.C. Cir. 1995, cert. dismissed 516 U.S. 1155 (1996)] at 1280. Indeed, *Barbour* specifically suggests that the district court consider the length of time employees in similar positions stay at the defendant employer as well as other employers, the time required to secure similar employment, and other factors. Moreover, on remand, the district court in Barbour only awarded one year of front pay, which was affirmed by this Court.  *See Barbour v. Merill*, 132 F.3d 1480 (D.C. Cir. 1997)(Table). Neither the district court nor appellee cites any case which suggests that an employee's subjective intent to remain at a job until retirement, *by itself*, justifies an award of front pay for the rest of her career.

Peyton v. DiMario, 287 F.3d 1121, 1129 (D.C. Cir. 2002).

If that is true when there has been an express waiver of sovereign immunity, how can it not apply to this case where there is no waiver whatsoever?

I appreciate that some state courts have permitted a discharged at-will employee to recover future pay when it has been established that comparable employment is simply not available. E.g., Kemper v.  Automated Finishing, Inc., 564 N.W.2d 692, 704 (Wis. 1997); Coffee v. Fayetee, 929

S.W.2d 326, 332 (Tenn. 1996).  It is only in this or analogous situations where the employee is

permitted future pay greater than, at most, the time it takes to find comparable work.  To permit

an employee to retire upon being fired, irrespective of age or the ability to find comparable work,

renders nugatory the principle that damages for breach of an employment contract must be

diminished by the wages the plaintiff earned or could have earned after being fired.  Durtsche v.

Am. Colloid Co., 958 F.2d 1007, 1011 (10th Cir. 1992) (Wyoming law; damages premised on

amount of compensation employee would have earned in remainder of contractual term must be

reduced by amount of damages employee earned or could have earned from other employment);

Ohanian v. Avis Rent A Car System, Inc., 779 F.2d 101, 110 (2d Cir. 1985) (same and resulting

amount must be discounted to present value).

Plaintiff answers that she was constructively discharged.  That concept and the award of

damages when it is found to have occurred applies only to an employee who faces intolerable

working conditions in retaliation for exercising a right protected by law.  Pennsylvania State

Police v. Suders, 542 U.S. 129, 141-43 (2004).  Thus, it can be asserted in a Title VII or whistle

blower action.  But, this is in action based on a contract and an employment contract between an

employer and an at-will employee when there has been no showing that the employee engaged in

activity protected by some statute and was nevertheless fired.  It would, to put it mildly, cause a

revolution in the traditional relationship between an employer and an at-will employee to allow a

cause of action on behalf of any at-will employee who complains that she was constructively

discharged when she leaves her employment of her own volition.  Whether such a cause of action

will ever come to be recognized in the workplace, it is impossible to conclude that the

government has waived its sovereign immunity against any such a radical transformation of the

rights of federal employees.  I therefore will not award the damages she seeks.  While the failure

of MSC to create the Financial Manager position might be deemed a substantial breach of the

settlement agreement, I conclude that plaintiff is entitled, at best, to nominal damages.

Having made the appropriate findings of fact and law, I recommend that plaintiff be

awarded nominal damages for the government's breach of paragraph 2 of the settlement

agreement.

**Failure to file timely objections to the findings and recommendations set forth in this
report may waive your right of appeal from an order of the District Court adopting such
findings and recommendations.  See <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).**

_____

JOHN M. FACCIOLA

Dated:                                                       UNITED STATES MAGISTRATE JUDGE